Philip . CAUTILLI

v.

GAF CORPORATION.

Civ. A. No. 81–2835.

United States District Court,
E. D. Pennsylvania,
Civil Division.

Jan. 12, 1982.

David C. Harrison, Philadelphia, Pa., for plaintiff.

K. Robert Conrad, Alan K. Cotler, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

This memorandum considers the sufficiency of a pleading alleging a claim for intentional infliction of emotional distress. The question arises on the Rule 12(b)(6) motion of defendant GAF Corporation, former employer of plaintiff Philip Cautilli to dismiss the fifth count of the above-captioned complaint. We turn first to a description of the plaintiff's well-pleaded facts, all of which we take as true for the purpose of ruling on the motion.

Sometime around October 1, 1978, plaintiff entered the employ of defendant as a chemist in the defendant's Latex Group. He was assigned to defendant's laboratory in Wayne, New Jersey, to which he commuted from his home in Feasterville, Pennsylvania.[1] About one year later, plaintiff received a salary increase, but no promotion. Dissatisfied, plaintiff immediately began to seek other employment. In the meantime, he continued to work in GAF's Latex Group.

Between October 1979 and April 1980, plaintiff developed six or eight new latex products. About April 1, 1980, he was advised that, if he would submit to several conditions, he would be promoted to Senior

---

1. Jurisdiction is founded on diversity of citizenship. 28 U.S.C. § 1332.

Technical Associate; he would receive a substantial salary increase; and, he would be entitled to share in the company's incentive bonus programs. The conditions to which plaintiff would be required to submit were: (1) he must commit himself to continued employment with the company; and (2) he must demonstrate his commitment by moving his home closer to GAF's Wayne laboratory. Because the defendant's proffer of a promotion meant that the defendant would commit itself to plaintiff's long-term employment, plaintiff, in return, gave his commitment to stay with the defendant, but he declined to move his home. Nevertheless, sometime in April 1980, plaintiff received the promotion and increased compensation. Pursuant to his commitment, plaintiff ceased seeking other work.

In September 1980, plaintiff learned that defendant was engaged in selling its Latex Group to Polysar Latex, a division of Polysar, Inc. ("Polysar"). Plaintiff learned that in the event of the contemplated sale, all latex research at the Wayne laboratory would be discontinued and that plaintiff, in the event that Polysar chose to retain him, would be required to move to one of several distant, and perhaps even foreign cities. The sale to Polysar became effective December 1, 1980. Plaintiff subsequently left his job rather than relocate his home and family in another city. This suit followed.

On the basis of the incidents we have related, plaintiff sued GAF for (1) breach of contract; (2) unjust enrichment; (3) fraud; (4) common law conspiracy; and (5) intentional infliction of emotional distress. As we have noted, defendant has moved to dismiss the fifth cause of action for failure to state a claim upon which relief can be granted.

Plaintiff's fifth cause of action is based upon allegations that prior to April 1980, and prior to seeking plaintiff's commitment to remain in its employ, defendant had determined to sell the Latex Group. Plaintiff alleges that he was intentionally induced to commit himself to defendant's employ in order to raise the sale price of the Latex Group. Furthermore, alleges plaintiff, defendant's officials and employees knew that the proposed sale would be detrimental and harmful to plaintiff, disregarded plaintiff's welfare, and in order to further defendant's goals, intentionally inflicted great emotional distress upon plaintiff.

In considering defendant's motion, we are faced with a choice between Pennsylvania and New Jersey law. The choice of law question could be significant because Pennsylvania law appears to be more hospitable to plaintiff's claim than does New Jersey law. We need not, however, choose between the laws of these states because, as defendant correctly argues, under the law of either state, plaintiff has failed to state a claim for the intentional infliction of emotional stress.

The Restatement (Second) of Torts § 46(1) (1965) sets forth elements of the tort of intentional infliction of emotional distress and the liabilities of a tortfeasor:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Pennsylvania has adopted this definition of the tort. *See, e.g., Lekich v. International Bsns. Mach. Corp.*, 469 F.Supp. 485 (E.D.Pa. 1979) (Lord, C. J.); *Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147 (1963); *Jones v. Nissenbaum, Rudolph & Seidner*, 244 Pa.Super. 377, 368 A.2d 770 (1976). The only New Jersey court explicitly to recognize this tort also follows this definition. *See Hume v. Bayer*, 157 N.J.Super. 310, 428 A.2d 966 (1981).

The *Restatement's* commentary sheds some light on the type of "extreme and outrageous conduct" which will give rise to a claim for the intentional infliction of emotional distress. The *Restatement* reserves liability for those whose behavior is extraordinarily despicable.

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and ut-

terly intolerable in a civilized community. Generally the case is one in which the recitation of the fact to an average member of the community would arose his resentment against the actor, and lead him to exclaim, "Outrageous."

*Restatement (Second) of Torts § 46c*, comment d (1965).

The extreme nature of conduct necessary to invoke this tort is demonstrated by the New Jersey and Pennsylvania cases in which liability has been found. In *Hume, supra*, the New Jersey Superior Court found a physician liable because he had notified parents that their child was suffering from a rare disease which might have been cancerous while in fact he knew that the child had nothing more serious than a mildly infected appendix. In *Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970), the Pennsylvania Supreme Court found that the withholding and concealing of a dead child's body constituted intentional infliction of emotional distress upon the parents. *See also Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254 (E.D.Pa. 1977), *aff'd en banc*, 595 F.2d 1265 (3rd Cir. 1979) (team physician's communication to newspaper reporters that plaintiff, a professional football player, was suffering from a rare blood disease capable of causing death and preventing plaintiff from ever again playing football, when physician knew such statement to be baseless, was sufficient basis for imposing liability).

Courts have steadfastly refused to extend the scope of this tort to anything but the most extreme and outrageous forms of misconduct. This has been most clearly evident in Pennsylvania. In *Forster, supra*, the defendant was a private investigator retained by an insurance company to ascertain the true extent of plaintiff's injury claim. Defendant conducted his surveillance by assigning a team of two men equipped with motion picture cameras to report on plaintiff's everyday activities and movements. In the course of this surveillance, plaintiff noticed the agents, armed with cameras, trailing her as she went about her business. She became extremely nervous and upset. As a result, she suffered frequent nightmares and hallucinations and required medical treatment. Her lawyer contacted defendant and requested that defendant terminate his surveillance scheme because of the toll it was exacting from his client. Defendant ignored this plea and continued surveillance, causing plaintiff on four additional occasions to be subjected to the knowledge that she was being followed. Despite the oppressiveness of this conduct, it was not found to be actionable as an intentional infliction of emotional distress. *See also Lekich, supra* (dismissal of employee for misuse of company telephones not actionable); *Jones, supra* (abusive and insulting conduct of debt collection agents in publicly and wrongfully threatening plaintiffs with expulsion from their home not actionable).

The limiting boundaries of this tort in New Jersey are less clear, for *Hume*, the only New Jersey case recognizing the tort, held defendant liable. The conduct found actionable in that case, though, was no less extreme and outrageous than the conduct involved in the Pennsylvania cases which found liability. In *Hume*, plaintiffs' son underwent surgery while in defendant's care. Although the surgery involved nothing more serious than the removal of a mildly infected appendix, defendant reported to plaintiffs that the appendix had not been removed, but that an eight to ten inch section of inflamed and possibly cancerous tissue had to be excised. Defendant related this misstatement fully conscious of its falsity. Indeed, defendant further indicated to plaintiffs that their son was suffering from Mesenteric Venous Thrombosis, an ailment rarely found in young people, and that a test would be run to determine if the excised tissue was malignant. No such test was ever conducted, although defendant later reported that the results were negative. Thus, *Hume* stands only as an example of the extreme and outrageous conduct to which this tort applies; it does not indicate that New Jersey courts liberally apply the

tort of intentional infliction of emotional distress.[2]

We must decide whether defendant's conduct, as a matter of applicable law, is sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. Only where reasonable men may differ is it for the jury, subject to the control of the court, to determine whether the conduct alleged in this case is sufficiently extreme and outrageous to warrant liability.[3] *See Restatement (Second) of Torts* § 46 comment h (1965). (In considering this motion to dismiss, we, of course, construe plaintiff's complaint as true and in a light most favorable to his case).

We do not think that defendant's conduct, as alleged by plaintiff, is the kind of extreme and outrageous conduct which will support a claim for intentional infliction of emotional distress. Conduct by an employer inducing an employee into committing himself to continued employment, while the employer knows that a change in circumstances may require the employee to relocate his home, cannot compare to, indeed, pales before, the extreme outrage of withholding a dead child's body from its parents (*Papieves*), a surgeon's knowingly misrepresenting the severity of a child's medical condition to its parents (*Hume*), or a physician's knowingly supplying newspaper reporters with false information that a football player was suffering from a grave, possibly fatal, illness (*Chuy*).

Plaintiff claims that liability is warranted because the defendant deceived the plaintiff into forgoing other employment opportunities in order to benefit itself. Though this sort of artifice may be offensive and unfair, we believe that neither Pennsylva-

nia nor New Jersey courts would consider it so extreme as to lay the foundation for a claim for intentional infliction of emotional distress. Also, we do not believe that these courts would extend this tort to cover an employment contract dispute such as that before us. To the contrary, application of this tort must be restricted to instances of extreme and outrageous conduct; indeed, the limited scope of the tort tolerates many kinds of unfair, unjust, and unkind conduct.

> The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

*Restatement (Second) of Torts* § 46 comment d (1965).

The only possible support for plaintiff's position comes from two Pennsylvania cases, *Fair v. Negley*, 257 Pa.Super. 50, 390 A.2d 240 (1978), and *Beasley v. Freedman*, 256 Pa.Super. 208, 389 A.2d 1087 (Pa.Super. 1978), which followed *Fair*. In *Fair*, plaintiffs alleged that defendant, their landlord, intentionally inflicted emotional distress upon them through his refusal to make the leased premises fit for human habitation. Plaintiffs complained that their living quarters were uninhabitable as a result of improper ventilation of a gas hot water heater and gas space heater, lack of heat, falling plaster, defective electric wiring, a malfunctioning water system, defective windows, broken porch steps and railings, and a leaking roof. In *Beasley*, plaintiffs sued for "slumlordism," which was construed by the Superior Court as a claim for intentional infliction for emotional distress. To sup-

---

**2.** Although it was decided before any New Jersey court had explicitly recognized the tort, some guidance as to the limits which New Jersey courts would place upon the scope of the tort of intentional infliction of emotional distress may be gleaned from *Schwartz v. United Jersey Bank*, 497 F.Supp. 335 (D.N.J.1980). Plaintiff in *Schwartz* alleged that bank employees should be held liable for giving erroneous information to a federal law enforcement agent. The court ruled that, even assuming that the tort were actionable under New Jersey law,

plaintiff's allegations did not state a claim for intentional infliction of emotional distress.

**3.** While the analytical approach required of us by this case basically involves reasoning by analogy, we confess that the analysis may involve less "reasoning" than it does mere comparison of visceral, emotional, and moral reactions to different factual circumstances. This type of ratiocination, however, is appropriate to the determination before us.

port their claim, plaintiffs cited, *inter alia*, rodent and insect infestation, structural defects, inadequate heating, defective plumbing, and exposed electrical wiring.

In both of these cases, the Pennsylvania Superior Court held that the plaintiffs had a right to allege and seek to prove that the defendant, by breaching the warranty of habitability, had intentionally inflicted emotional distress upon them. In so doing, the Superior Court pointed to the *Restatement (Second) of Torts* § 46 comment e (1965), which noted that landlords previously had been held liable for intentional infliction of emotional distress "for extreme abuse of their position."

We do not think that Pennsylvania courts would extend the principles of *Fair* and *Beasley* beyond the peculiar context of landlord-tenant relations. Landlords under Pennsylvania law occupy a special status in their relations with their tenants which imposes upon them special duties and restricts their freedom of action. Indeed, this area of Pennsylvania law has recently become suffused with doctrines designed to facilitate a public policy of safe and sanitary housing. *See Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897, 905 (Pa.1979) (establishing implied warranty of habitability); *Fair*, 390 A.2d at 245 (landlord may not obtain waiver from tenant of warranty of habitability). *Fair* and *Beasley* thus appear to represent a special genre of cases in which tort liability for intentional infliction of emotional distress is used to buttress other legal sanctions directed towards policing the conduct of landlords in respect to their tenants and properties. Absent clear guidance from Pennsylvania courts, we are reluctant to analogize the employment contract dispute before us to the landlord-tenant disputes in *Fair* and *Beasley*.[4]

For all the foregoing reasons, we conclude that Count 5 of plaintiff's complaint alleging intentional infliction of emotional

distress fails to state a claim upon which relief can be granted and must be dismissed with prejudice.

---

4. We also note that, independent of the special duties and liabilities appurtenant to the landlord's status, the conduct described by plaintiffs in *Fair* and *Beasley* is much more susceptible to condemnation under § 46 of the *Restatement* than is the conduct plaintiff herein describes. Conduct either causing or tolerating such conditions as vermin and insect infestation and dangerous defects in housing facilities may well establish a plausible basis on which to build a claim for intentional infliction of emotional distress.